RECEIVED
IN LAKE CHARLES, LA

MAR 13 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| IN RE OMEGA PROTEIN, INC. | : | DOCKET NO. 04 CV 02071 |
| | : | JUDGE MINALDI |
| | : | MAGISTRATE JUDGE WILSON |

### MEMORANDUM RULING

This matter arises out of the October 4, 2004 allision between the F/V Gulf Shore, a fishing vessel owned and operated by Omega Protein, Inc. ("Omega"), and offshore platform 17B owned by Samson Contour Energy E&P, LLC ("Samson"). In response to the allision, Omega initiated this action for limitation of liability pursuant to the Limitation of Liability Act ("the Act").[1] Four claimants answered Omega's complaint– Samson and three crewmembers of the Gulf Shore ("Personal Injury Claimants").

The court bifurcated the trial of the issues. Phase I concerned the Omega's right to exoneration or limitation. A bench trial on this issue was held from February 5, 2007 to February 7, 2007.

### FACTS

In the early morning hours of October 4, 2004, the F/V Gulf Shore set out from Cameron,

---

[1] The Act was originally contained in 46 U.S.C.App. §§ 181-189. In 2006, in order to complete the codification of Title 46, Congress reorganized and restated the laws which formerly appeared in the appendix to that title. Pub. L. No. 109-304, § 2, 120 Stat. 1485 (2006). The Act now appears in chapter 305 of Title 46 at 46 U.S.C. 30501-30512. *See id.* § 6, 120 Stat. at 1512.

1

Louisiana for Fresh Water Bayou to fish for menhaden. Shortly before the allision, the vessel's Chief Engineer brought to the attention of Captain Luther Stewart that a necessary component of the vessel's refrigeration system was not functioning properly.

In order to inspect the component, Captain Stewart turned on the wheelhouse lights. Captain Stewart subsequently placed a cell phone call to the Omega plant in Cameron to request that a replacement component be air dropped as soon as possible. He then placed a second call to Omega's Abbeville, Louisiana plant. While on this call, the Gulf Shore allided with platform 17B. This platform is situated among a cluster of oil platforms known as the Joseph's Harbor Rigs.

## ANALYSIS

The Limitation of Liability Act ("the Act") "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446, 121 S.Ct. 993, 1000 (U.S. 2001). While the Act created the right to seek limited liability, the actual procedure for a limitation action is set forth in Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims. *Id.* at 448, 121 S.Ct. at 1001. The Supreme Court explained the procedure in general terms, as follows:

> The district court secures the value of the vessel or owner's interest, marshals claims, and enjoins the prosecution of other actions with respect to the claims. In these proceedings, the court, sitting without a jury, adjudicates the claims. The court determines whether the vessel owner is liable and whether the owner may limit liability. The court then determines the validity of the claims, and if liability is limited, distributes the limited fund among the claimants. *Id.*

The court employs a two-part analysis to determine whether the shipowner is entitled to limitation. *See, e.g., Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976). First, as to each

claimant, the court must decide whether the shipowner's negligence or conditions of unseaworthiness caused the accident. *Id.* On this question, the claimant bears the burden of proof. *Id.*

If the claimants successfully establish the shipowner's liability, the court must then determine whether the shipowner had knowledge or privity of those acts or conditions which caused the accident. *Id.*; *see also* 46 U.S.C. § 30505(b) (formerly 46 U.S.C.App. §§ 183(a)). This is the "privity or knowledge" question and, on this question, the shipowner bears the burden of proof. *Farrell Lines Inc.*, 530 F.2d at 10.

### *Negligence or Unseaworthiness*

As noted above, the claimants bear the burden of proving Omega's liability. Because the Gulf Shore allided with an oil platform, the claimants benefit from the presumption of fault that arises when a moving vessel strikes a visible stationary object. *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809 (1895); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794 (5th Cir. 1977), *cert. denied* 435 U.S. 924, 98 S.Ct. 1488 (1978); *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 450 (5th Cir. 1987) ("We do not think that the presumption should apply to allisions with sunken and hidden objects.").

A moving vessel may rebut this presumption by showing, by a preponderance of the evidence, that the allision was (1) the fault of the stationary object, (2) that the moving ship acted with reasonable care, or (3) that the collision was an unavoidable accident. *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988) (citing *Bunge Corp.*, 558 F.2d at 795 and others). Thus, the general rule presuming fault of the moving vessel does not apply where the stationary object was also guilty of a statutory violation (i.e., a failure to have operational light

and noise warning systems). *Alamo Barge Lines, Inc. v. Rim Maritime Co., Ltd.*, 596 F.Supp. 1026, 1033 (E.D.La. 1984); *Davis v. Superior Oil Co.*, 510 F.Supp. 1162, 1166 (E.D.La.1981) (collecting cases).

In the instant case, Omega alleges that the stationary object was at fault because it did not have operational lights or fog horns. The court finds that Omega sufficiently proved that platform 17B did not have operational lights on the morning of the accident. Three of the Gulf Shore's crewmembers and at least two other boat captains – all of whom actually viewed the platform on the morning of the accident– testified that the platform did not have functioning lights.

Although Samson's lighting experts testified that the lights were operational when they conducted post-allision tests, it is entirely possible that the lights were repaired prior to their inspections. Troy Whetstone of Baker Energy, who was employed by Samson to maintain 17B, was sent to the platform immediately after the allision for the purpose of checking for pollution and structural damage. Mr. Whetstone testified that he also boarded the platform and tested the lights. However, because Baker Energy does not keep monthly maintenance records for 17B, other than Mr. Whetstone's own testimony, there is no evidence to support the assertion that proper maintenance was conducted or to rebut the assertion that Mr. Whetstone actually repaired the lights while aboard the platform.

The failure to have operable lights on a fixed structure constitutes a statutory violation. *See* 33 C.F.R. § 67.01-1, *et seq.* As such, the rule presuming fault of the moving vessel does not apply and the burden remains upon the claimants to prove negligence.

Samson and the personal injury claimants carried this burden and proved by a preponderance of the evidence that Captain Stewart violated Rules 5 and 7 of the International Rules (COLREGS).

*See* 33 U.S.C. § 1602, *et seq.*[2] Rule 5 requires every vessel to maintain a proper lookout by sight and hearing, as well as by all other available means. By turning on the wheelhouse lights, Captain Stewart created a mirror effect on the wheelhouse windows and also diminished his night vision. Use of his cell phone also precluded Captain Stewart from maintaining a proper lookout.

Rule 7 requires vessels to use all available means to determine if a risk of collision exists (i.e., radar). Much like the mirror effect on the windows, when wheelhouse lights were illuminated, Captain Stewart was unable to properly view his radar screen. Additionally, there was substantial testimony that Captain Stewart did not make effective use of his radar while navigating through the Joseph's Harbor Rigs.

Samson and the Personal Injury Claimants therefore established acts of negligence and proved that these acts contributed to the allision. The burden then shifts to Omega to prove that it did not have knowledge or privity of those negligent acts.

### *Privity or Knowledge of Omega*

The privity or knowledge question is critical because the shipowner can only limit its liability if the accident was occasioned or incurred *without* his privity or knowledge. "Privity or knowledge" implies some sort of complicity in the fault that caused the accident. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991) (citations omitted). The privity or knowledge inquiry is fact intensive. *Id.* at 355-356 ("The question of 'privity or knowledge must turn on the facts of the individual case.'" (quoting *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975))).

---

[2] The COLREGS, while still in force, are no longer reproduced in either Title 33 of the United States Code or Title 33 of the Code of Federal Regulations. *See* 15 C.J.S. *Collision* § 33, n. 1. However, they are reproduced in the Coast Guard Commandant Instruction (COMDTINST) M16672.2D, which is available at http://www.uscg.mil/vtm/navrules/navrules.pdf.

Privity or knowledge can be actual or constructive. *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999) (citing *Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 512, 52 S.Ct. 450 (1932)). "[A] corporate shipowner may be deemed to have constructive knowledge if the unseaworthy or negligent condition could have been discovered through the exercise of reasonable diligence." *Brister*, 946 F.2d at 356. "A corporate owner, therefore, must overcome a presumption not only that its officers and managers had actual knowledge, but also that they should have known of the unseaworthy or negligent condition that caused the injury." *Id.* (citing *In re Patton-Tully Transp. Co.*, 797 F.2d 206, 211 (5th Cir. 1986)).

"Generally, a finding of negligence indicates complicity in the cause of the accident sufficient to make limitation unavailable.... Nonetheless, even if negligence caused the seaman's injury, an owner can still limit its liability in at least two situations." *Id.* (citations omitted). "First, '[w]here the acts of negligence result not from any lack of competence on the part of the crew, but rather are merely 'mistakes of navigation,' the shipowner is not precluded from the limitation of liability.'" *Id.* (citing *In re Hellenic Lines, Ltd.*, 813 F.2d 634, 638 (4th Cir.1987)). "Second, '[w]hether a corporation has 'privity or knowledge' of a negligent act may be determined on the basis of whether the negligent employee is sufficiently high in the corporate hierarchy to make his awareness that of the corporation.'" *Id.* (citations omitted).

With regard to the first situation– mistakes of navigation– these errors are not usually attributed to the shipowner for the purposes of determining privity and knowledge. *In re Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996) (discussing *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982)). However, the shipowner has a nondelegable duty to man the ship with a qualified master and crew. *Empire Seafoods, Inc. v. Anderson*, 398 F.2d

204, 210 (5th Cir. 1968). In this respect, the Fifth Circuit has considered whether a shipowner had knowledge of a master's past navigational errors. *In re Kristie Leigh Enterprises, Inc.*, 72 F.3d at 482.

As the cause of the Gulf Shore's allision with platform 17B is most accurately characterized as a mistake of navigation, the question becomes whether Omega exercised reasonable care in selecting a qualified and competent master?

At the time of the allision, Captain Stewart had worked in commercial fishing in the Gulf aboard vessels similar to the Gulf Shore for over 20 years. He had worked for Omega and its predecesor company for approximately 20 years. He held a Masters License from the U.S. Coast Guard, licensing him to operate vessels such as the Gulf Shore. He had no hearing or vision problems. Most importantly, until the instant allision, Captain Stewart had operated menhaden vessels without incident. *See In re Hellenic Lines, Ltd.*, 813 F.2d at 639 (shipowner properly relied upon second mate to stand watch where second mate's license authorized him to do so); *In re Kristie Leigh Enterprises, Inc.*, 72 F.3d at 482 (finding shipmaster was competent where he "was a properly licensed tug captain with over thirty years of experience" and with the exception of one accident, had a clean record); *The G. K. Wentworth*, 67 F.2d 965, 966 (9th Cir. 1933) ("[A]n owner who has appointed a competent shipmaster is entitled to rely on his judgment...and should not hamper the further exercise of his judgment with instructions and orders.").

The court therefore finds that Captain Stewart was a qualified master and that Omega exercised reasonable care in selecting him to captain the Gulf Shore. Thus, Omega had neither privity nor knowledge of the negligent acts which caused the Gulf Shore to allide with platform 17B.

Accordingly, Omega shall be entitled to limit its liability.

*Allocation of Fault*

Based on the foregoing facts, the court finds that the apportionment of fault for the allision and resulting damages is: Omega 50% and Samson 50%.

*Valuation*

The liability of the shipowner shall not exceed the value of the vessel and pending freight. 46 U.S.C. § 30505; *Guillot v. Cenac Towing Co.* 366 F.2d 898, 911 (5th Cir. 1966) ("The theory of the limitation of liability Act is that the shipowner is not liable for damages or injuries occurring without its privity or fault beyond the value of the vessel (and pending freight) immediately after the casualty."). The usual and customary method for determining damages is the market value of the vessel in the case of loss. *Carl Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950) (citing *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 45 S.Ct. 465 (1925)).

Michael E. Wilson, Omega's Vice President of Marine Operations, testified that the fair market value of the Gulf Shore following the allision was $340,000. *See also* Omega's Ex. 2 (Wilson Aff.). There is no compelling reason to disbelieve Mr. Wilson's testimony.

## CONCLUSION

Accordingly, Omega's liability will be limited to $340,000 prior to reduction for Samson's percentage of comparative fault or interest adjustment.

Lake Charles, Louisiana, this ___9___ day of ___March___, 2007.

PATRICIA MINALDI
UNITED STATES DISTRICT COURT