RECEIVED
IN LAKE CHARLES, LA

JUL - 2 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

IN RE OMEGA PROTEIN, INC.          :          DOCKET NO. 04 CV 02071

                                   :          JUDGE MINALDI

                                   :          MAGISTRATE JUDGE WILSON


### MEMORANDUM RULING

Before the court is Samson Contour Energy E&P, LLC's ("Samson") Motion for a New Trial and/or Motion to Alter or Amend Judgment [doc. 111]. Samson's motion is opposed by Omega Protein, Inc. ("Omega"). Omega has also filed an unopposed Motion to Strike Exhibit A to Samson's reply brief [doc. 126]. Oral arguments on Samson's motion were heard on May 22, 2007 and the matter was taken under advisement.

### BACKGROUND

The facts and procedural history of this case are set out in the court's March 9, 2007 Memorandum Ruling. In short, after a three day bench trial, the court found that Omega was entitled to limit its liability to $340,000, the value of the vessel and cargo, subject to a reduction for Samson's percentage of fault. The court reasoned as follows.

To determine whether a shipowner is entitled to limit his liability, the court must first decide whether the shipowner's negligence or conditions of unseaworthiness caused the accident; the claimants bear the burden of proof. If the shipowner is liable for the accident, the court must then decide whether the shipowner had knowledge or privity of those acts or conditions which caused the

accident; here, the shipowner bears the burden of proof.

On the liability/negligence question, the court found that because Samson did not have operable lights on the platform, Omega was able to rebut the presumption of fault which arises when a moving vessel strikes a stationary object. However, the court found that Samson proved that Omega was negligent because its vessel's captain violated the Rules of the Road– he did not maintain a proper lookout and did not effectively determine whether a risk of collision existed.

On the privity or knowledge question, the court reasoned that because "the cause of the Gulf Shore's allision with platform 17B is most accurately characterized as a mistake of navigation, the question [was] whether Omega exercised reasonable care in selecting a qualified and competent master?"[1] The court found that the Gulf Shore's captain, Captain Stewart, was a qualified master due to his extensive experience. Thus, the court held that although Omega was negligent, it was entitled to limit its liability to the value of the vessel and its cargo because it had neither privity nor knowledge of the acts which caused the accident.

The court allocated fault evenly between Omega and Samson due their joint negligence– e.g., Omega's violation of the Rules of the Road and Samson's failure to have operable lights on its platform. The court also found the limitation fund to be properly valued at $340,000.

During the interval between trial and rendition of the above judgment, Samson and Omega jointly settled the personal injury claims.[2] On April 25, 2007, the court dismissed all claims by the personal injury claimants.

---

[1] Mem. Ruling 7.

[2] *See* Breaud Letter (March 23, 2007) [doc. 113].

2

## RULE 59(a) STANDARD

Rule 59(a) states, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or
> part of the issues...in an action tried without a jury, for any of the
> reasons for which rehearings have heretofore been granted in suits in
> equity in the courts of the United States. On a motion for a new trial
> in an action tried without a jury, the court may open the judgment if
> one has been entered, take additional testimony, amend findings of
> fact and conclusions of law or make new findings and conclusions,
> and direct the entry of a new judgment.[3]

Whether to grant a new trial is left to the sound discretion of the trial judge. The court's authority

in this area is concededly "large."[4]

"A new trial may be granted, for example, if the district court finds the verdict is against the

weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error

was committed in its course."[5] If the verdict is contrary to the weight of evidence, a new trial is

necessary to prevent a miscarriage of justice.[6]

## RULE 59(e) STANDARD

The Fifth Circuit restated the standard on a Rule 59(e) motion as follows:

A Rule 59(e) motion "calls into question the correctness of a judgment." This Court
has held that such a motion is not the proper vehicle for rehashing evidence, legal
theories, or arguments that could have been offered or raised before the entry of

---

[3] FED. R. CIV. P. 59.

[4] *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433, 116 S.Ct. 2211, 2222
(1996) ("the authority of trial judges to grant new trials...is large.").

[5] *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (internal citations
omitted).

[6] *U. S. for Use and Benefit of Weyerhaeuser Co. v. Bucon Const. Co.*, 430 F.2d 420, 423
(5th Cir. 1970).

judgment. Rather, Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly.[7]

As such, the generally recognized grounds for granting a Rule 59(e) motion are: (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, (3) the need to correct a clear error of law or prevent manifest injustice.[8]

"[W]hile a district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration, such discretion is not limitless."[9]  The trial court must strike a balance between "two important judicial imperatives": (1) the need to bring litigation to an end  and (2) the need to render just decisions on the basis of all the facts.[10]

## ANALYSIS

Samson seeks a new trial on the grounds that the verdict is against the weight of evidence.[11] This reason for granting a new trial is ordinarily applied to cases tried before a jury.[12]  Indeed, it

---

[7] *Templet v. HydroChem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004) (internal citations omitted).

[8] *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002).

[9] *Templet*, 367 F.3d at 479 (5th Cir. 2004) (citing *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir. 1990)).

[10] *Id.*

[11] Samson avers that if the court's ruling is allowed to stand, it will be unable to recover "more than $4 million in platform damages."  It is unclear how Samson arrived at this figure. Samson's expert estimated the cost of repair to be between $380,000 and $1.8 million.   Because it was not accompanied by an affidavit, however, the expert report which contained these estimates was stricken from the record by the court's January 23, 2007 Judgement.

[12] *See, e.g.*, 11 WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 2806 ("The judge's power to set aside the verdict is supported by clear precedent at common law

seems odd to suggest that the trial judge's verdict is against the weight of evidence when the trial judge was the factfinder. Nevertheless, Samson asserts that the court committed a manifest error of law in not applying *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*,[13] a recent Fifth Circuit Limitation Act case. Samson also asserts that the court failed to make findings of fact on or consider two critical issues of fact tending to prove that the Gulf Shore was unseaworthy.

### *Failure to apply* **Trico Marine Assets Inc.**

Before discussing the applicability of *Trico Marine*, Samson suggests that the court "mistakenly infers that the only burden Omega actually had to bear at trial on [the privity or knowledge] issue was the burden of proving merely that it exercised reasonable care in selecting a qualified and competent master."[14] Samson argues that the court "overlooked the remainder of Omega's burden of proving not only that it did not know, bu that it could not have known through the exercise of reasonable diligence of any of the acts of negligence or unseaworthy conditions of the M/V GULF SHORE that caused and contributed to the casualty in question."[15]

In making this argument, it is clear that Samson fails to fully appreciate the court's ruling. The court found that, because Omega was negligent, it was presumed to be have privity or

---

and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it."); *cf. Eyre v. McDonough Power Equipment, Inc.*, 755 F.2d 416, 420 (5th Cir. 1985) ("Deference is accorded [the judge's] firsthand opportunity to view the witnesses and their demeanor, and he is empowered to grant a motion for new trial when he determines that the verdict is against the great-but not merely the greater-weight of the evidence.") (citing *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360 (5th Cir. 1980)).

[13] 332 F.3d 779 (5th Cir. 2003).

[14] Supp. Mem. 6 (emphasis omitted).

[15] *Id.* (emphasis omitted).

knowledge. However, the court explained that this presumption could be overcome where, as here, "the acts of negligence result not from any lack of competence on the part of the crew, but rather are merely 'mistakes of navigation.'"[16] Thus, implicit in the court's ruling is the conclusion that, because Captain Stewart was a competent master, Omega could not have known through the exercise of reasonably diligence of the acts of negligence that caused the Gulf Shore's allision with Samson's platform.

Samson further argues that on the privity or knowledge question, the court committed legal error by applying *In re Kristie Leigh Enterprises, Inc.*,[17] instead of *Trico Marine*. However, as Omega points out in its reply brief, *Trico Marine* is clearly distinguishable from the case at bar. In fact, in distinguishing *Kristie Leigh*, the *Trico Marine* court wrote, "[T]he present case presents far more than mere navigational errors."

In stark contrast to *Kristie Leigh* and the instant case, the captain of the vessel at fault in *Trico Marine*: departed in dense fog knowing "visibility that morning was extremely restricted";[18] did not employ a lookout;[19] had never been trained to use the vessel's radar unit;[20] "[ran] the vessel at full speed, approximately 18 knots, even though the engine noise would make it difficult to hear the radio or the fog signals of other vessels";[21] had complained of the engine noise problem to his

---

[16] Mem. Ruling 6 (quoting *Brister v. A.W.I., Inc.*, 946 F/2d 350, 356 (5th Cir. 1991)).

[17] 72 F.3d 479 (5th Cir. 1996).

[18] *Trico Marine*, 332 F.3d at 783.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 784.

6

shipowner and was forced to use an external speaker to hear the radio;[22] ran the vessel without running lights;[23] failed to make radio contact with other vessels; and used improper passing maneuvers.[24] Based upon these fact, the district court found that the shipowner knew the at-fault vessel "had operated in the fog and would continue to do so, yet employed a captain without proper qualifications and without adequate policies or procedures to guide him."[25]

### Failure to Consider Captain Stewart's Competence with Radar & Pinpoint Navigational Charts as Proof of Unseaworthiness

Samson argues that the Gulf Shore was unseaworthy because: (1) Captain Stewart's lacked training and knowledge of the anti-collision/guard alarm on the Gulf Shore's radar unit which rendered him an incompetent captain and (2) Captain Stewart lacked training and misused the electronic Pinpoint Navigational Charts (coupled with Omega's failure to ensure that the vessel had paper charts).

As for Captain Stewart's alleged lack or training and knowledge of radar, Samson points to the court's finding that "there was substantial testimony that Captain Stewart did not make effective use of his radar while navigating through the Joseph Harbor Rigs."[26] Samson suggests that the court should have elaborated on this issue. Samson asserts that the anti-collision/guard alarm "would have

---

[22] *Id.* at 783-84.

[23] *Id.* at 784.

[24] *Id.*

[25] *Id.* at 790.

[26] Supp. Mem. 13 (quoting Mem. Ruling 5).

more probably than not prevented the allision at issue."[27]  It further asserts that Omega failed to provide Captain Stewart any training and that this was exacerbated by his failure to obtain a radar endorsement to his license.

Omega concedes that Captain Stewart was not looking at his radar at the time of the allision and points to the testimony of Captains Mitchell, Fisher and Schools, who testified that they do not use collision alarms while traversing the Gulf.  Omega asserts that the uncontroverted testimony was that collision alarms are useless because the Gulf is littered with so many obstructions.  Moreover, Omega argues that the captains testified that the alarms are intended to be used to warn of anchor drift while moored at night and not while actively running.

As to lack of training and misuse of the Pinpoint Navigational Charts, Samson asserts that Captain Stewart operated the Gulf Shore without properly updated paper or pinpoint charts in violation of 46 C.F.R. § 28.225(a).  Samson further asserts that Captain Stewart did not know how to properly update pinpoint charts.  Samson concludes that had Omega supplied the Gulf Shore with updated paper charts or trained Captain Stewart on the Pinpoint Navigational System, it is more likely than not that the allision would not have occurred.

Omega suggests that Samson's argument "pretermits Captain Stewart's testimony that at the time of the allision he had the wheelhouse light on so that he could use his cell phone" and that, in accordance with the court's finding that there were no functioning lights on Samson's platform, Captain Stewart did not see the platform in his direct line of navigation.[28]  Omega argues that Samson fails to understand that "in setting the pinpoint navigational system's course, there will

[27] *Id.* at 14.

[28] Opp. Mem. 9.

8

always be objects, both stationary and moving, that cross the straight line course plotted."[29] Finally, Omega argues that since Samson's platform had been at its present location for 20 years, it should have been on every chart produced during that period of time. This fact, Omega intimates, would have obviated the need to update charts in relation to the platform at issue.

In support of its argument that a shipowners failure to have current charts amounts to negligence and unseaworthiness, Samson cites *In re TT Boat Corporation*.[30] In *TT Boat*, the court held that the shipowner, Tidewater, had a nondelegable duty to update chats on board its vessels.[31] Tidewater's failure to inspect the vessels for updated charts resulted in the court concluding that it had privity and knowledge of the unseaworthy condition.[32]

The *TT Boat* court, however, limited its holding to the facts of the case. The court stated, "The court need not consider, then, whether the standard for finding privity and knowledge for the property damage claimants would be different tha[n] for personal injury claimants, as the only claimants remaining have personal injury claims only."[33] Considering that *TT Boat* involved only personal injury claims, whereas the instant matter involves only property damage claims, it is distinguishable.

Furthermore, despite Samson's assertions to the contrary, a court's finding of seaworthiness "need not be made mechanically, checking off each and every conceivable cause of the loss, but,

---

[29] *Id.*

[30] No. 98-494, 1999 WL 223165 (E.D. La. April 14, 1999).

[31] *Id.* at *13.

[32] *Id.*

[33] *Id.* at *14 n. 3.

9

rather, permits a more global approach-one that entails an overall sifting and weighing of the relevant evidence."[34] "In [the seminal case of *The S.S. Hewitt*, 284 F. 911 (S.D.N.Y. 1922)], Judge Learned Hand made it quite clear that, to achieve a limitation of liability, a shipowner need not 'go [ ] over the possibilities, item by item.' Rather, the shipowner must 'undertake[ ] to prove that, whatever the cause of the loss, he was ignorant of it; that burden he undertakes, with all the possibilities which it may involve.'"[35] Indeed, at trial, Omega sufficiently proved that it was ignorant of the errors and omissions which caused the allision.

### *Omega's Motion to Strike*

Omega moves the court to strike Exhibit A to Samson's Reply Memorandum. Exhibit A consists of Omega's answers to Samson's first set of interrogatories. Omega argues that the exhibit should be stricken because it was not admitted at the trial of this matter, it is not in the trial record, and does not constitute newly discovered evidence. This motion was referred to chambers due to the hearing date and Samson filed a memorandum indicating that it has no opposition to striking the exhibit.

Rule 59(a) provides that "[o]n a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."[36] However, the weight of authority suggests that any new evidence must have been

---

[34] *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 6 (1st Cir. 1999).

[35] *Id.* at 5.

[36] FED. R. CIV. P. 59.

available at the time of judgment.[37]  Courts have similarly excluded evidence on motions to amend/alter judgment.[38]  At the same time, courts must "balance carefully the need for finality with the need to render a just decision *on the basis of all the facts.*"[39]

Samson's Exhibit A offers few, if any, facts that were not already adduced at trial.  For this reason, the exhibit is both harmless and unnecessary  It will be stricken from the record.

## CONCLUSION

For the above reasons, Samson's Motion for a New Trial and/or Motion to Alter or Amend Judgment will be denied.  Omega's Motion to Strike will be granted and Exhibit A to Samson's Reply Brief will be stricken from the record.

Lake Charles, Louisiana, this ___2___ day of June, 2007.

PATRICIA MINALDI
UNITED STATES DISTRICT COURT

---

[37] *See, e.g., Campus Sweater and Sportswear Co. v. M. B. Kahn Const. Co.*, 515 F.Supp. 64, 86 (D.S.C. 1979) (document which had never been admitted into evidence could not be considered by court on motions for judgment notwithstanding verdict or for new trial).

[38] *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) ("We have held that an unexcused failure to present evidence available at the time of summary judgment provides a valid basis for denying a subsequent motion for reconsideration."); *Navarro v. Fuji Heavy Industries, Ltd.*, 117 F.3d 1027, 1032 (7th Cir. 1997) ("The insuperable difficulty for the plaintiff is that a motion to alter the judgment may not be based on evidence that was available when the district judge took the motion for summary judgment under advisement but that was not presented then.") (Posner, J.).

[39] *Templet*, 367 F.3d at 481 (Dennis, J., dissenting).

11